IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LESLIE HUNTER, | ) | Case No. 1:17-cv-0405 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |
| | ) | |

## I.    Introduction

Plaintiff, Leslie Hunter, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and Hunter has failed to identify any error of law in the ALJ's evaluation of her claim, I recommend that the final decision of the Commissioner be **AFFIRMED.**

## II.    Procedural History

Leslie Hunter applied for supplemental security income on May 17, 2013.  (Tr. 144-149)  She alleged a disability onset date of November 25, 2005.[1]  (Tr. 144)  Her application was denied initially on July 15, 2013 (Tr. 100-102) and after reconsideration on December 20, 2013.  (Tr.

---

[1] At the administrative hearing, Hunter amended her alleged onset date to April 30, 2013.  (Tr. 24, 43)

107-108)  Hunter requested an administrative hearing (Tr.112), and Administrative Law Judge ("ALJ") Peter Beekman heard the case on May 11, 2015.  (Tr. 40-67)  The ALJ found that Hunter was not disabled in an October 7, 2015 decision.  (Tr. 21-35)  Hunter requested review of the hearing decision on October 20, 2015.  (Tr. 20)  On January 23, 2017, the Appeals Council denied review, rendering the ALJ's conclusion the final decision of the Commissioner.  (Tr. 1-4)  On February 28, 2017, Hunter filed this action challenging the Commissioner's final decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Leslie Hunter was born on September 16, 1960 and was 52 years old when she applied for disability benefits.  (Tr. 144)  She has a high school education and completed four or more years of college.  (Tr. 162)  She has previous work experience as a general clerk (light, semi-skilled) and as a construction laborer (heavy, unskilled.)  (Tr. 59-60, 162, 224)

### B.    Medical Evidence – Physical Impairments

Hunter established care with Kavitha Srighanthan, MD, in February 2013.  She reported a history of osteoarthritis in her knees and hips and scoliosis which caused intermittent back pain.  (Tr. 315)  During the past three months, she had occasional numbness around her perineum and gluteal region when walking.  (Tr. 316)  Dr. Srighanthan ordered a CT scan and referred Hunter to physical therapy.  (Tr. 318)

A CT scan on February 27, 2013 showed spondylotic changes in the lumbar spine, worst at L5-S1, with anterolisthesis of L5 on S1 which was worse in the standing position.  (Tr. 320-322)

Hunter met with resident physician, Rupa Juthani, M.D., on March 27, 2013.  (Tr. 244-245)  Hunter reported chronic low back pain with a two month history of daily saddle numbness

and right lower extremity numbness.  (Tr. 245)  Hunter said that her back pain had been getting worse for the past three to four months.  She rated her pain as 8/10 and described it as sharp burning and throbbing; it was fluctuating but always present.  She reported paresthesia in the right second through fourth toes.  The pain was aggravated by sitting, standing and walking.  (Tr. 246)  Hunger's gait, motor strength, sensation, and reflexes were all normal.  Straight leg raise testing was negative.  (Tr. 248)  Dr. Juthani's impression was "low back pain and episodic saddle anesthesia with severe stenosis at L5/S1 and spondylolisthesis."  (Tr. 248)  He noted that Hunter was neurologically grossly intact and ordered an MRI of her cervical/lumbar region.  (Tr. 248)

Hunter presented to Dr. Murray Andrew Greenwood at the MetroHealth Pain Management and Rehabilitation clinic on April 16, 2013.  She complained of bilateral hip, back, and shoulder, and knee pain - right greater than left.  Her pain was aggravated with weight bearing and cold; it was sharp and achy at night.  It awakened her at night.  Pain was alleviated with Vicodin and Percocet, but Naproxen did not help.  (Tr. 269)  Physical examination showed that Hunter ambulated without an assistive device and moved easily from sit to stand and with transfers to the examination table.  She was able to heel, toe, and tandem walk, crouch and return to standing.  (Tr. 271)  Dr. Greenwood felt that Hunter's presentation and examination were consistent with bilateral patellofemoral syndrome, suspected osteoarthritis and right shoulder impingement.  He prescribed Voltaren gel and Vicodin and ordered X-rays and MRIs.  (Tr. 272)  X-rays of the knees and right shoulder were normal.  (Tr. 274, 275)  X-rays of the hips revealed no abnormality of the hips but arthritic changes at the L5-S1 level of the spine.  (Tr. 275)

On April 19, 2013, an MRI of Hunter's cervical spine showed broad-based disk protrusion at the C2-C4 level with mild effacement of the anterior cerebrospinal fluid space.  At the C5-C6 level, there was a central disk protrusion, which was slightly eccentric to the right, an uncovertebral spurring causing mass effect upon the spinal cord, and an encroachment upon the

right neural foramen.  At the C6-C7 level there was a central disc protrusion and effacement of the anterior cerebrospinal fluid space with associated mild cord compression.  (Tr. 240)

An MRI of Hunter's lumbar region performed on the same day showed degenerative changes in the lower lumbar spine including grade 1 anteriorlisthesis of L5 on S1 with a disc extrusion; facet arthropathy with severe bilateral neural foraminal stenosis and mass effect on the exiting nerve roots bilaterally at this level; mild right neural foraminal encroachment; and mild to moderate encroachment of the left neural foramen at L4-L5.  (Tr. 242)

Hunter met with Dr. James S. Anderson on May 8, 2013 and reviewed the MRI and myelogram and CT post myelogram.  Dr. Anderson recommended surgery due to the severe angle at the L5-S1 disc space.  (Tr. 239)

On June 4, 2013, Hunter complained of pain in her right foot.  The pain was dull and made worse by standing and walking.  (Tr. 407)  Hunter's range of motion was normal and her muscle strength was intact.  (Tr. 408-409)  She had normal extremities, normal gait, normal reflexes, intact sensation, and no motor deficits.  (Tr. 409)

On July 12, 2013, Hunter met with Dr. Anderson who again discussed surgery and explained the complications of the procedure.  (Tr. 373)

Hunter met with Dr. Greenwood for pain management on July 30, 2013.  She complained of knee pain, right more than left, and increased back pain.  Her last urine toxicology screen was positive for cocaine, marijuana and alcohol; so she was advised that no more narcotics would be prescribed.  (Tr. 383)  Hunter was able to heel, toe, and tandem walk, and crouch and return to standing.  She had full motor strength and intact strength in her lower extremities.  Seated straight leg raise test was positive at 80%.  Dr. Greenwood injected Depomedrol and prescribed Voltaren, Mobic, and Gabapentin.  (Tr. 387)

Dr. Anderson performed L5-S1 decompression and fusion surgery on September 10, 2013.  (Tr. 723, 805-808)  Hunter's post-operative diagnosis was grade 2 spondylolisthesis and L5-S1, spinal instability; right L5 and S1 radiculopathy.  (Tr. 723)  On September 25, 2013, Hunter followed up with physician's assistant, Erin E. Anderson.  Hunter had back pain near her incisions; her legs were beginning to improve but she still had some right leg numbness.  She was using a walker.  She had full motor strength, intact sensory function, and negative straight leg raise test.  (Tr. 795-796)  She was limited to lifting 10 pounds and was told to avoid long periods of sitting or standing and to change positions of weight bearing as often as possible.  (Tr. 796)

On October 23, 2013, Hunter met with Dr. Antwon Morton for pain management.  (Tr. 847-853)  Hunter was wearing a back brace and using a cane.  She complained of burning pain in the right lower extremity from the thigh into the foot.  She reported that she was able to do everything for herself but that it took extra time.  (Tr. 848)  Right hip flexion and abduction were limited to 4/5.  (Tr. 851)  She had tenderness to palpation to her midline L3-S2, bilateral paraspinals and coccyx and knees.  Tenderness to right gluteus medius/minimus region worsened with resisted hip flexion/abduction and she had decreased range of motion.  (Tr. 852)  Dr. Morton injected Depomedrol and prescribed Voltaren gel and increased Gabapentin.  (Tr. 852)  He diagnosed thoracic or lumbosacral radiculitis, acquired spondylolisthesis, pain in lower leg joint, gait disturbance, and gluteus medium or minimum syndrome.  (Tr. 855)

An X-ray of Hunter's lumbar spine on November 1, 2013 showed postoperative changes as well as degenerative changes.  (Tr. 825)

Hunter returned for pain management on December 9, 2013.  She continued to wear her back brace a few hours a day, especially in the morning.  She rated her pain as 8/10.  (Tr. 931)

Physical examination findings were mostly unchanged.  (Tr. 935)  Dr. Morton increased

Hunter's Gabapentin prescription.  (Tr. 936)

On December 11, 2013, Hunter met with Dr. Anderson who noted that she was "holding

her own."  He started her on some isometric exercises and instructed her to start weaning off the

back brace.  (Tr. 941)

In early January 2014, Hunter went to the gynecologist for possible vaginitis.  The doctor

noted that she was ambulating without difficulty.  (Tr. 959)

Hunter went to the emergency room on February 10, 2014 complaining of right wrist

pain and lower back pain.  Hunter had tenderness in her lumbar region and right wrist, but full

and painless range of motion.  She had a small amount of swelling over her second and third

knuckles on her right hand.  (Tr. 979)  An X-ray of the right wrist showed arthritic changes at the

first metacarpophalangeal joint.  (Tr. 976)  Diagnoses were wrist tendonitis and lower back pain.

(Tr. 981)

On March 12, 2014, Hunter told Dr. Morton that she continued to have pain in her low

back, right arm and right trapezius.  (Tr. 1025)  Hunter said her knees were feeling better but

indicated she had sharp and stabbing pain in her back and tail bone.  She complained of

numbness and burning in her right leg and foot.  She was still using a back brace and cane when

she left her house but was slowly weaning herself from the back brace.  (Tr. 1026)  Physical

examination showed that Hunter was able to ambulate without an assistive device and moved

easily from sit to stand and with transfers to the examination table.  She was able to heel, toe, and

tandem walk and was able to crouch and return to standing.  (Tr. 1030)  Dr. Morton diagnosed

lumbosacral radiculitis, grade two spondylolisthesis, gait disturbance, acquired spondylolisthesis,

long term tobacco use disorder, and cervical spondylosis with radiculopathy.  He injected

Depomedrol, continued Hunter's medications and encouraged isometric exercises. (Tr. 1031-1032)

Hunter followed-up with Dr. Anderson on March 17, 2014. She reported fatigue in her back and a new pain in her tailbone with sitting. Dr. Anderson thought that she had not solidly fused yet and that she was adjusting to her new posture. (Tr. 1037) She was continuing use of the bone stimulator. (Tr. 1037) Dr. Anderson diagnosed acquired spondylolisthesis and cauda equine syndrome. (Tr. 1039)

Hunter continued to receive treatment for pain management. (Tr. 1094, 1150, 1232) She continued to have pain in her lower back, right arm, mid-sacral region, and knee, but the pain was improved. Pain was worse with rain, cold temperatures and activity. She still experienced numbness and tingling in her right foot. (Tr. 1094, 1150-1151). Examination revealed decreased sensation in right L5 dermatome and right C6, C7, and C8 dermatomes; tenderness and mild spasms at the upper trapezius on the right and mild spasm; decreased range of motion of the lumbar spine, and tenderness to palpation midline sacrum and coccyx and tenderness to palpation over tibial tuberosity bilaterally. (Tr. 1155-1156, 1237) The right trapezius, arm and wrist pain were believed to be a component of the tendinitis but were also concerning for cervical radiculopathy based upon the multilevel degenerative changes, cord compression and encroachment upon the neural foramen at C5-C6. (Tr. 1237-1238) In December 2014, Hunter ambulated without an assistive device; was able to heel, toe and tandem walk and crouch and return to standing. She had full strength in her upper and lower extremities. (Tr. 1155) Diagnoses were low back pain, lumbosacral radiculitis, deconditioned low back, pain in lower leg, and gait disturbance. (Tr. 1097, 1156, 1238) She continued to take Neurontin, Vicodin, and use Lidocaine patches and the bone stimulator. (Tr. 1094) She also received injections of Depomedrol and Toradol. (Tr. 1097, 1156, 1238)

Hunter went to the emergency room on July 22, 2014 for pain in her right hip and buttock, occasional numbness and burning, and tingling down the posterior right leg.  (Tr. 1104)  Hunter was discharged with an assessment of acute or chronic lumbosacral radiculopathy.  (Tr. 1105)

Hunter followed-up with physician's assistant, Erin Anderson, on September 5, 2014, one year after her back surgery.  She complained of pain in her "tailbone" and in her right posterior leg.  Hunter was still wearing her back brace when out of her house.  She had continued using the bone growth stimulator until it "died."  Hunter had decreased smoking.  (Tr. 1121)  Examination showed tenderness to L5-S1 and decreased left knee and right lower extremity strength at 4+/5.  Ms. Anderson diagnosed L5-S1 radiculopathy and was concerned that Hunter may have pseudoarthrosis.  A CT scan was ordered to check for loosening hardware.  Hunter's prescription for Vicodin was filled a final time and Neurontin was increased to 1200 mg.  (Tr. 1122)

The CT scan performed on September 18, 2014 showed status post interbody as well as posterior fixation of L5-S1 and incomplete union but no evidence of hardware failure.  (Tr. 1124)  An X-ray of the sacrum-coccyx showed surgical hardware within L5-S1 fusion but the sacrum was partially obscured due to overlying bowel gas.  (Tr. 1161)

On October 6, 2014, Hunter was told to limit her back brace use for strenuous activity and to begin physical therapy.  (Tr. 1138)  On January 29, 2015, Hunter returned to neurosurgery and reported continued tailbone pain and left leg tingling.  An X-ray of the lumbar spine showed posterior fusion of the L5-S1 level with intact hardware and no acute soft tissue or bony abnormality identified.  (Tr. 1210)  Hunter was instructed to treat with pain management because the neurosurgery department did not provide long term pain management.  (Tr. 1206)

8

### C.    Medical Evidence – Mental Impairments

On October 23, 2013, Rita Kanareff, a registered nurse therapist, assessed Hunter's

mental health.  (Tr. 838-843)  Hunter wanted to talk to someone because she was the primary

caregiver for her mother, who had been diagnosed with cancer.  (Tr. 838)  Hunter reported

depression, anxiety and PTSD.  (Tr. 839)  On examination, Hunter was anxious and depressed.

(Tr. 842)  Her thought process was logical with tight association; her judgment and insight were

fair; recent and remote recall were good; her attention span and concentration were sustained;

and her fund of knowledge was okay.  (Tr. 842)  Ms. Kanareff diagnosed depression, not

otherwise specified, and generalized anxiety disorder.  She referred Hunter to therapy but did not

recommend any psychiatric medication.  (Tr. 843)

In November 2013, Hunter started counseling therapy with Nellie Krawczynski, a

licensed clinical social worker.  (Tr. 874-877)  Hunter reported that she was doing much better

physically after her back surgery, but she was still wearing a back brace and using a cane.

Hunter held her emotions inside; she had a difficult childhood because her brother tortured her.

(Tr. 874)  Her behavior was cooperative but restless and anxious; she had tight associations; her

mood was anxious; and her affect was constricted.  (Tr. 875)  Her diagnoses continued to be

depressive disorder, NOS, and generalized anxiety disorder.  (Tr. 877)

Hunter continued to receive counseling.  By December 20, 2013, Hunter's mood was

very euthymic.  She was feeling better; her back was recovering and she was able to do more

than she could in the past.  (Tr. 946)  By January 3, 2014, Hunter was feeling less depressed and

was motivated to make changes for the future.  Her symptoms were noted to be in partial

remission.  (Tr. 953)

On January 20, 2014, Hunter expressed frustration with family stressors.  She reported

that she had to walk to the store to do shopping for her mother and this caused back pain where

she had her surgery.  (Tr. 966)  On February 19, 2014, Hunter reported feeling more dejected.

She was more depressed than at previous sessions.  She was having trouble sleeping, racing

thoughts and was worried about life stressors.  (Tr. 1003)  In early March, Hunter's depressed

mood and loneliness continued and she reported crying at night because she felt "deserted."  She

also had to get up and walk around due to back pain at her session.  (Tr. 1017)  By March 18,

2014, plaintiff reported improved mood.  Her mood was described as euthymic and she had tight

association.  (Tr. 1056)  On April 7th, Hunter had a mild increase in avolition and did not want to

be bothered.  She was more melancholy and stated that her boyfriend had left without

explanation.  She was having trouble sleeping again and felt that her pain caused her to be in a

"snarky" mood.  (Tr. 1063)  In June 2014, Hunter reported that she had decreased isolation and

was trying to take walks.  She was helping her ex-boyfriend with paperwork and babysitting.

(Tr. 1081)

     **D.**    **Opinion Evidence**

           **1.**    **Psychological Consultative Exam – David V. House – June 2013**

David V. House evaluated Hunter on June 17, 2013.  (Tr. 353-360)  Hunter reported

using cannabis and crack cocaine but drinking alcohol sparingly.  (Tr. 355)  Dr. House observed

that Hunter appeared to be in pain; "[s]he groaned when she got out of her seat and moved very

slowly."  She seemed confused and her speech was pressured.  Hunter reported crying episodes

on a daily basis for no reason.  She denied any suicidal gestures, though she had recently thought

about suicide.  (Tr. 356)  She described mood swings.  (Tr. 357)  Hunter was oriented to person,

place, time, and situation; was persistent; and tried to complete tasks.  Her long term and short-

term memory were intact.  She had difficulty with rapid pace and organizing her thoughts.

Hunter complained of difficulty concentrating and that she could not read much.  (Tr. 358)  Dr.

House believed that Hunter's prognosis was poor.  (Tr. 359)  He felt that Hunter was able to

follow instructions and perform simple and multi-step tasks and multi-step directions.  (Tr. 359-360)  He also opined that Hunter would be "at least somewhat dysfunctional in a work environment and disruptive from the standpoint that likely she wouldn't show up."  He diagnosed mood disorder, not otherwise specified, posttraumatic stress disorder and polysubstance abuse in partial remission.  He assigned a Global Assessment of Functioning ("GAF") of 45.  (Tr. 360)

### 2.      Physical Consultative Exam – Hasan Assaf, M.D., - July 2013

At the state agency's request, Dr. Hasan Assaf examined Hunter on July 1, 2013.  She complained of low back pain radiating into her right leg and numbness of the leg worsened with standing, walking, bending and lifting.  She also complained of neck pain that began in 2005.  It radiated into her right shoulder and sometimes traveled all the way to her right hands/fingers and associated numbness and tingling sensation in the right arm and fingers.  The pain in her knees began in 1991 but was progressing; it worsened with standing, walking and weight bearing.  (Tr. 362)  Hunter reported that she cooked twice a week and cleaned twice a week.  She watched TV, listened to the radio and read.  Dr. Assaf observed that she walked with a mild limp on the right.  She could not walk on her heels or toes because she complained of pain in her right knee and hip.  (Tr. 364)  Hunter was positive for straight leg raises bilaterally at 30 degrees, and had tenderness over both knees, right hip, right wrist, and right foot laterally.  (Tr. 365)  She had normal strength in her arms and legs.  (Tr. 367)  Range of motion was decreased in the cervical spine, (Tr. 368) dorsolumbar, (Tr. 369) bilateral hips and bilateral knee flexion.  (Tr. 370)  Dr. Assaf diagnosed lumbar disc disease, cervical disc disease, hypertension, and pain in both knees, bilateral hips, right wrist, and right foot consistent with degenerative joint disease.  (Tr. 366)  Dr. Assaf felt that Hunter had marked limitations in activities involving prolonged standing, walking, bending and lifting; and moderate limitations in activities requiring reaching with the right arm.  (Tr. 366)

### 3. State Agency Reviewing Psychologists

Dr. Frank Orosz, Ph.D., reviewed plaintiff's records on July 5, 2013.  Dr. Orosz found that Hunter's depression and anxiety were severe.  (Tr. 74)  Her mental impairments resulted in mild restrictions in activities of daily living; mild difficulty maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 74)  He opined that Hunter was able to perform simple and some more complex tasks if not fast paced. (Tr. 78-79)

On December 13, 2013, Aracelis Rivera, Psy.D., reviewed Hunter's records and found that her anxiety and depression were severe impairments.  Dr. Rivera agreed with the opinions expressed by Dr. Orosz regarding the functional limitations caused by Hunter's mental impairments.  (Tr. 90-91)

### 4. State Agency Reviewing Physicians

On July 11, 2013, state agency physician, Jan Gorniak, D.O., reviewed Hunter's file and opined that she could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk and sit for 6 hours in an 8 hour workday; and was unlimited in her ability to push and pull.  (Tr. 76)  She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs and ladders, ropes and scaffolds.  (Tr. 76-77)  She had no manipulative, visual, communicative, or environmental limitations.  (Tr. 77)

On December 18, 2013, Rannie Amiri, M.D., reviewed Hunter's records and agreed that she could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk and sit for 6 hours in an 8 hour workday; and was unlimited in her ability to push and pull.  (Tr. 92)  Dr. Amiri opined that Hunter could frequently balance, kneel and crouch; and could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; stoop and crouch.  (Tr. 92-93)  Dr. Amiri agreed that Hunter had no manipulative, visual, communicative, or environmental limitations.  (Tr. 93)

### 5. Medical Source Statement – Nellie Krawczynski, LISW – April 2015

On April 20, 2015, Nellie Krawczynski, Hunter's social worker, completed a questionnaire regarding Hunter's mental capacity. (Tr. 1147-1148) Ms. Krawczynski noted that Hunter had clinical level depression and anxiety which would impair her functioning. (Tr. 1148) She opined that Hunter would only occasionally be able to follow work rules; maintain regular attendance and be punctual within customary tolerance; deal with the public; and work in coordination with or proximity to others without being distracted or being distracting. (Tr. 1147)

### E. Relevant Testimonial Evidence

Hunter testified at the hearing. (Tr. 43-59) Hunter's worst pain varied between her knees, hips, tailbone and back. Her pain worsened on rainy days. (Tr. 46) Hunter's daily activities included watching movies, fixing something to eat, occasionally visiting her mother and walking her pit bull, crocheting, doing embroidery and reading. She did dishes every two to three days and laundry once a month. (Tr. 47-49, 52-53) She was unable to do anything on days after she went shopping due to pain. (Tr. 47, 56) Her medications made her sleepy; she slept for a couple of hours after she took them in the morning. If she needed to go anywhere, she didn't take the medications. (Tr. 48) Ms. Hunter used a hot water bottle or a heating pad to assist with pain relief. (Tr. 49) She also used a cane but was trying to stop using it. (Tr. 53) She was able to stand and walk for about 10 minutes. (Tr. 56) She could lift a glass of water, but lifting a gallon jug caused pain. (Tr. 57) Hunter started receiving mental health treatment for her depression a few months before the hearing. (Tr. 58) Her depression made her feel like she did not want to get out of bed. (Tr. 59) Hunter was not taking any medications for depression. (Tr. 59)

Kathleen Reis, a vocational expert, also testified at the hearing.  (Tr. 59-67)  Relevant to Hunter's arguments, Ms. Reis testified that no employment would be available to someone who missed two days of work each month.  (Tr. 63)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## V.      The ALJ's Decision

The ALJ issued a decision on October 7, 2015 setting forth the following paraphrased findings:

1. Hunter had not engaged in substantial gainful activity since April 30, 2013, the application date.  (Tr. 26)

2. Hunter had the following severe impairments: degenerative disc disease of the back, affective disorder, scoliosis, and osteoarthritis.  (Tr. 26)

3. Hunter did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 27)

4. Hunter had the residual functional capacity to perform light work.  She could lift/carry 20 pounds occasionally and 10 pounds frequently.  She could stand/walk 6 hours in an 8-hour workday.  She could sit 6 hours in an 8-hour workday.  She could occasionally push/pull with foot pedals with her right lower extremity and constantly with the left.  She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, or crawl.  She could frequently balance, kneel, or crouch.  She could occasionally perform overhead reaching with the right upper extremity and constantly with the left. She could not be exposed to high concentrations of extreme cold, wetness, or humidity.  She could only occasionally be around dangerous machinery or unprotected heights.  She could perform simple routine tasks that would take 1-3 months to learn.  (Tr. 30)

5.  Hunter was capable of performing past relevant work as a general clerk.  (Tr. 35)

Based on the foregoing, the ALJ determined that Hunter had not been under a disability from April 30, 2013, the day her application was filed.  (Tr. 35)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.

16

1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

### B.    Residual Functional Capacity

### 1.    Light Work Capability

Hunter argues that the ALJ erred in determining that she was capable of performing light work.  She points to substantial evidence supporting a finding that she was limited to sedentary

work. She also contends that substantial evidence supports a finding that she would miss work at least twice a month. ECF Doc. 11, Page ID# 1330-1335.

An ALJ's residual functioning capacity determination is proper when it is based upon "all of the relevant medical and other evidence." 20 C.F.R. § 416.945 (a)(3). At its most basic level, a claimant's residual functional capacity is simply an indication of [her] work-related abilities despite her limitations. *See* 20 C.F.R. § 404.1545(a)(1). The residual functional capacity is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2). Accordingly, the ALJ bears the responsibility for determining a claimant's residual functional capacity based on all of the relevant evidence. *See* 20 C.F.R. § 404.1545(a)(3).

Hunter contends that a limitation to sedentary work would have been consistent with the consultative examiner's opinion and the restrictions given to her by physician's assistant, Erin Anderson. ECF Doc. 11, Page ID# 1331. She also points to the facts that she was still using her back brace and her cane and that she did not have full union after one year. She points to her own testimony regarding her pain and how long she was able to walk.

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence. Here, the ALJ cited substantial evidence supporting his RFC finding that Hunter could perform light work, including: Hunter had good relief with Neurontin medications; bilateral knee x-rays were negative on April 16, 2013; there were normal clinical findings related to Hunter's knees and hips; Hunter was walking without an assistive device on April 15, 2013; she was able to heel, toe, and tandem walk; she was able to crouch and return to standing; she exhibited full motor strength to the lower extremities; she had intact sensation to light touch; normal reflexes in the knees and ankles. On May 18, 2013, a physical revealed normal extremities and gait and no motor deficits. (Tr. 31) The ALJ's determination that Hunter

was capable of performing light work was also consistent with the opinions of the state agency physicians.  (Tr. 34, 76-77)

The ALJ also cited the following evidence following Hunter's back surgery on September 10, 2013:

> Thereafter, progress notes indicate that Neurontin helped relieve symptoms and that back pain had decreased (Exhibit 10F/36).  On January 9, 2013, the claimant ambulated without difficulty (Exhibit 12F/44).  An x-ray of the lumbar spine, on November 1, 2013, showed degenerative and postoperative changes (Exhibit 10F/3).  On September 5, 2014, the claimant's gait was normal (Exhibit 14F/60).  There was intact sensory and negative bilateral straight leg raise.
>
> The claimant, on December 18, 2014 presented to Antwon Morton, D.O. (Exhibit 16F/7).  The claimant ambulated without an assistive device.  She was able to heel, toe, and tandem walk and crouch and return to standing.  She exhibited full 5/5 strength to the upper and lower extremities and negative straight leg raise (Exhibit 16F/7-8).  There was decreased sensation at the right L5 dermatome and decreased lumbar spine flexion at 45° and extension at 5° with pain.  An x-ray showed posterior fusion of the L5-S1 level with intact hardware on January 28, 2015 (Exhibit 16F/62).

(Tr. 32)

Hunter does not argue that there was no evidence supporting the ALJ's RFC finding. Rather, she contends that there was evidence supporting a different finding – that she was limited to sedentary work.  The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1999); *see also Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Moreover, the evidence cited by Hunter in support of her argument does not compel a different finding. For example, Hunter argues that a sedentary work limitation was supported by the opinion of consulting physician, Dr. Assaf. However, Dr. Assaf merely stated that Hunter had marked limitations in activities requiring prolonged standing, walking, bending and lifting. (Tr. 366) He did not specifically limit Hunter's abilities to sedentary work. And, even if he had, his opinion was formed before Hunter's back surgery. Medical evidence in the record showed that Hunter improved after her back surgery. The ALJ referred to this evidence in support of his RFC finding. (Tr. 32) Thus, Dr. Assaf's opinion provides little support for Hunter' argument that she was limited to sedentary work.

Hunter also cites the restrictions placed on her by the neurosurgery's physician's assistant, Erin Anderson. (Tr. 796) However, these restrictions were given to regulate Hunter's activity in the immediate period after her back surgery. Treatment notes from later follow-up appointments do not reflect the same restrictions. In fact, at an appointment in October 2014, Hunter was told to limit her use of the back brace to strenuous activity and to start physical therapy. (Tr. 1138) Thus, the restrictions given by Ms. Anderson two weeks after Hunter's surgery did not continue to support a sedentary work limitation.

Hunter also points to her own subjective complaints of pain and her continued use of the back brace and cane. However, the ALJ was not required to accept Hunter's complaints of pain at face value. *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability.") And, Hunter was instructed to limit her use of the back brace. (Tr. 1138) She testified that she was trying to stop using the cane. (Tr. 53) Thus, the evidence suggests that these assistive devices may not have even been necessary on a daily basis.

The ALJ supported his RFC determination with citations to the medical evidence including the opinions of the state agency reviewing physicians.  (Tr. 30-35)  Hunter does not argue that the ALJ's determination lacked the support of substantial evidence.  Rather, she argues that there was evidence in the record supporting a different finding – that she was limited to sedentary work.  However, as noted above, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Mullen,* 800 F.2d at 545.  Substantial evidence supported the ALJ's finding that Hunter was capable of light work and I do not recommend remand on this basis.

### 2.      Attendance Limitation

Hunter next argues that there was substantial evidence in the record supporting a finding that she would miss work at least twice a month.[3]  ECF Doc. 11, Page ID# 1333.  Consulting mental examiner, Dr. House, opined that Hunter "would be at least somewhat dysfunctional in a work environment and disruptive from the standpoint that likely she wouldn't show up."  (Tr. 360)  Hunter contends that Dr. House's opinion is consistent with a finding that she would miss two or more days of work per month.  She argues that the ALJ improperly relied on portions of Dr. House's opinion but did not assign proper weight to this particular statement in his evaluation.  ECF Doc. 11, Page ID# 1333.  However, the ALJ was not required to accept every restriction noted by Dr. House.  *See Salisbury v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 13792 AT *19-20, (N.D. Ohio 2013) citing, *Sonnenlitter v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 145131, 2012 WL 4794639, at *15 (N. D. Ohio Oct. 9, 2012); *Smith v. Astrue,* 2012 U.S. Dist. LEXIS 178670, 2012 WL 6607007, at *8 (N. D. Ohio Dec. 18, 2012).  The ultimate responsibility for determining the claimant's RFC lies with the ALJ.  *Nejat v. Comm'r of Soc.*

---

[3] The VE testified that an individual who missed work four or more times per month would not be able to sustain employment.  (Tr. 63)

*Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009). The ALJ was permitted to assign little weight to one of Dr. House's statements based on his finding that this statement was not consistent with the record as a whole. (Tr. 34)

Hunter also argues that a finding that she would miss two or more days of work was consistent with Ms. Krawczynski's opinion that Hunter would only occasionally be able to maintain regular attendance and be punctual within customary tolerances. (Tr. 1147) Hunter argues that the ALJ did not consider and address Ms. Krawczynski's medical source opinion. ECF Doc. 11, Page ID# 1335. Contrary to Hunter's argument, the ALJ did consider Ms. Krawczynski's opinion, stating:

> A social worker is not an acceptable medical source but an "other" source (20 CFR 416.913(a) and 416.913(d)). The regulations provide that I may use evidence from "other" sources to show the severity of an impairment and how it affects an individual's ability to work (20 CFR 404 416.913(d)). On April 20, 2015, Nellie Krawczynski, licensed independent social worker (LISW), opined that the claimant could only occasionally perform several mental activities of work such as following work rules, maintaining regular attendance and being punctual within customary tolerance, dealing with the public, and working in coordination with or proximity to others without being distracted or distracting on a sustained basis (Exhibit 15F/1). I give this opinion little weight since these severe limitations are not supported by the record. Additionally, she did not give any reasons for these limitations such as if the claimant was experiencing an exacerbation of her mental condition at the time that she rendered this opinion.

(Tr. 34)

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources.'" *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources,' the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 99471, 2014 WL 3670078 (N.D. Ohio); see also *Brewer v. Astrue*, 2012 U.S. Dist. LEXIS 10643, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p, 2006 SSR LEXIS 5 does not include an express requirement for a certain level of analysis that

must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'")  Here, the ALJ considered Ms. Krawczynski's opinion and explained why he did not assign greater weight to it.  Hunter has not identified any legal error in the ALJ's treatment of Ms. Krawczynski's opinion.  His RFC determination was supported by substantial weight.  I do not recommend remand on this basis.

###### C.    Whether the ALJ Properly Analyzed Hunter's Pain

Finally, Hunter argues that the ALJ did not properly assess her pain or her credibility regarding her limitations.  When a claimant presents pain as a cause of disability, the Sixth Circuit's decision in *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986) states the proper analytical framework:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*See also, Brown v. Bowen,* 836 F.2d 549, 1987 U.S. App. LEXIS 16897 at *14-15 (6th Cir. 1987).

Objective medical evidence of pain includes evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption.  The determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals.  Both alternative tests focus on the claimant's "alleged pain." Although the cases are not always clear on this point, the standard requires the ALJ to assume arguendo pain of the severity alleged by the claimant and then determine whether objective medical evidence confirms that severity or whether the medical condition is so bad that such severity can reasonably be expected.  *Wines v. Comm'r Soc. Sec.,* 268 F. Supp.2d 954, 957 (N.D. Ohio 2003).

When there is no objective medical evidence sufficient to support a disability finding, the claimant's statements about the severity of her symptoms must be considered along with other relevant evidence in deciding whether a person is disabled:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483 (July 2, 1996).

Similarly, 20 C.F.R. 416.929(c)(3)(i)-(vi) also requires the claimant's statements concerning pain to be considered, even when there are no objective findings that would explain the pain:

> We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements.

Here, the ALJ analyzed the medical evidence in the record, noting findings such as normal gait, (14F/60) full strength in the upper and lower extremities and negative straight leg raise, testing (Exhibit 16F/7-8); and x-ray imaging showing posterior fusion of the L5-S1 level with intact hardware on January 28, 2015 (16F/62). (Tr. 32) The ALJ also recognized evidence supporting Hunter's allegations of pain: she had a history of back musculoskeletal impairment, she ambulated with a mild limp, she had decreased range of motion, etc. (Tr. 31-32) The ALJ also noted that medical records showed that Hunter was complaining of pain. (Tr. 31) The ALJ determined that the claimant's medically determinable impairments could reasonably be

expected to cause her alleged symptoms.  However, he felt that her statements regarding the
intensity, persistence and limiting effects of these symptoms were not fully credible.  (Tr. 33)

The ALJ's credibility findings are entitled to deference because he had the opportunity to
observe Hunter and assess her subjective complaints.  *Buxton v. Halter,* 246 F.3d 762, 773 (6th
Cir. 2001).  However, the ALJ cannot decide credibility based solely upon an "intangible or
intuitive notion about an individual's credibility."  Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.
Rather, such determinations must find support in the record.  When a claimant's complaints
regarding symptoms, or their intensity and persistence, are not supported by objective medical
evidence, the ALJ must make a determination of the credibility of the claimant in connection
with his or her complaints "based on a consideration of the entire case record."

The regulations set forth factors that the ALJ should consider in assessing credibility.
These include the claimant's daily activities; the location, duration, frequency, and intensity of
the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of
medication; and treatment or measures, other than medication, taken to relieve pain.  20 C.F.R. §
416.929(c)(3)(i)-(vi).  If the ALJ rejects the claimant's complaints as not fully credible, he must
clearly state his reasons for doing so.

Here, the ALJ explained:

The claimant's assertions are not supported by the record to the extent alleged.
For example, at the hearing, the claimant testified that she can stand for only 10 to
15 minutes, walk for only 10 to 15 minutes, and sit for only 10 minutes.  She
reported that she has pain with lifting 1 gallon of water but that she can lift a glass
of water without pain.  However, the medical records do not indicate significant
problems standing, walking, sitting, or lifting.  At a recent examination, the
claimant ambulated without an assistive device (Exhibit 16F/7).  She was able to
heel, toe, and tandem walk and crouch and return to standing.  She exhibited full
5/5 strength to the upper and lower extremities and negative straight leg raise
(Exhibit 16F/7-8).  I find that these clinical findings do not give support for the
claimant's said limitations.

The claimant has described activities which are not limited to the extent one
would expect given the complaints of disabling symptoms and limitations.  In

25

activities of daily living, the claimant has mild restriction.  She performs a range of daily activities.  In a report of contact, the claimant reported that she does her own cleaning and cooking (Exhibit 3E/1).  In a function report, the claimant reported that she feeds her pets and gives them water (Exhibit 4E/3).  At a consultative examination, the claimant reported that she cooks twice a week and cleans twice a week (Exhibit 5F/4).  She reported that she watches television, listens to the radio, and reads (Exhibit 5F/4).  She reported that she walked to the store and shopped for groceries for her mother (Exhibit 12F/51).  She reported that she was helping her boyfriend with babysitting and paperwork (Exhibit 14F/11).  At the hearing, the claimant testified that she watches movies during the day, prepares meals, visits her mother, crochets, does embroidery, reads, walks her pit bull and does dishes.

Required treatment for the claimant's mental impairment has been routine and conservative.  At the hearing, she testified that she has only seen a counselor 4 to 5 months and takes no psychiatric medications.  Additionally, the claimant reported that she takes Neurontin and Voltaren medications and Lidoderm patches for her physical impairments.  Of note, the claimant was refused narcotics due to cocaine use.  I find that this undermines her credibility.

(Tr. 33-34)

Hunter argues that the ALJ did not "genuinely" consider or analyze her complaints of pain.  She then points out various medical records reflecting her reports of pain, and having described it as "sharp, burning, throbbing, achy, and stabbing."  Hunter has not cited any authority stating that an ALJ is required to restate all of the various descriptions of pain found in the record.  And, the ALJ's decision *did* describe some of Hunter's pain complaints.  For example, he noted that Hunter "reported that she was having low back pain . . . she described that pain as sharp and continuous at a "10" on a 10-pain level.  She reported that pain traveled to both inguinal areas and down the right leg and was associated with numbness in the leg.  She reported that pain was worse on standing, walking, bending, and lifting."  (Tr. 31)  Hunter's argument that the ALJ did not sufficiently consider her complaints of pain is not well taken.  Nor is it apparent that the ALJ's consideration of her pain was "superficial."  Rather, it appears that he considered her complaints of pain throughout his decision, but decided that her reports of pain were not fully credible.

26

Similarly, Hunter argues that the ALJ did not consider the medications that she was taking and any side effects they caused.  However, the ALJ's decision contains numerous references to Hunter's medications.  For example, the ALJ noted that Hunter had been getting good relief from Neurontin, was given a Depo Medrol injection and prescribed Voltaren, Mobic and Gabapentin medications.  (Tr. 31)  As for side effects, Hunter testified that the medications made her sleepy, but she also testified that she wouldn't take them when she needed to go somewhere.  (Tr. 48)  Thus, it appears that the ALJ considered Hunter's medications and Hunter does not explain how a more complete discussion of her medications would have changed the ALJ's decision.

As noted above, the court must defer to the ALJ's credibility findings because he had the opportunity to observe Hunter and assess her subjective complaints.  Here, the ALJ concluded that Hunter's pain was not as severe as she represented.  This finding is not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001).  The ALJ stated objective reasons for his credibility determination and it should not be reversed.  The court cannot overturn an ALJ's decision which is supported by substantial evidence even if it might have resolved the factual issues differently. *Foster*, 279 F.3d at 353.  I recommend that the ALJ's decision be affirmed.

## VII.    Recommendations

The ALJ's decision is supported by substantial evidence, and Hunter has failed to identify any error of law in the proceedings at the administrative level.  I recommend that the final decision of the Commissioner be **AFFIRMED,** pursuant to 42 U.S.C. § 405(g).

Dated: December 22, 2017

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).